(38 Misc. Rep. 438.)

## L. D. GARRETT CO. v. HALSEY.

### SAME v. SIMPSON.

### SAME v. PAGE.

(Supreme Court, Special Term, New York County. July, 1902.)

1. CONTRACT—RESCISSION—MUTUAL MISTAKE.

A contract will be rescinded for mutual mistake of both parties as to material facts, where plaintiff relied absolutely on the statement of the defendants, and the defendants knew, or should have known, that he was acting in reliance upon such truth.

Actions by the L. D. Garrett Company against William A. Halsey, John B. Simpson, and J. S. Page. Judgments for plaintiff.

Cardozo & Nathan, for plaintiff.

Stimson & Williams, for defendants.

HALL, J. I do not regard it as necessary to state the facts in these cases, further than such as are necessary to a decision of the law questions involved.

The defendants were members of the executive committee of the board of directors of the Traders' Fire Insurance Company of New York, the insurance business of which was managed and carried on by the firm of Lockwood & Forman, as managers appointed by its board of directors under the provisions of its charter, leaving only the investment and care of its funds, and a general supervision of the managers, to the board of directors. The managers reported to the directors, on the first of each month, the general condition of the company as to its assets and liabilities, and the business done for the preceding month. On or about April 1, 1900, the managers made a statement of the condition of the company which showed a deficiency of assets of $77,957.20, and the same was presented to the directors. The executive committee had several meetings during April, and the question of reinsuring the risks of the company was discussed, and finally agreed to and carried out. Negotiations were then opened between the committee and the plaintiff for the purchase by it of at least 65 per cent. of the stock of the company. A copy of the statement of April 1st had been handed to plaintiff by Mr. Lockwood, one of the managers and a director of the company, and, at a meeting of the executive committee on the 26th or 27th of April, plaintiff's president, Mr. Garrett, was present, and had this statement with him, and one or more copies of it were before the committee; all of the defendants were present, and a general discussion was had regarding the reinsurance of the company and the purchase of the stock by plaintiff. An offer was made by him to purchase at least 65 per cent. of the stock at 40 per cent. of its face value, or $40 per share, but as the report was as of April 1st, and there had probably been losses happening or reported since that time, he insisted that there should be deducted from the purchase price, or allowed him on account of the same, the amount of any losses since April 1st. One of the directors (General Tracy) suggested that it would be more agreeable to have a flat cash

offer made for the stock, and let plaintiff make such examination of the books as would assure it of the amount of losses reported since April 1st, and then take its chances in that regard. This suggestion was acted upon, and about April 28th and 30th plaintiff did examine into the question of such losses, and after some further discussion it made an offer, on May 9th, to pay $40 per share for at least 65 per cent. of the stock, less any sum which it might be compelled to pay on account of losses not included in the statement of April 1st, which showed such losses to be $86,200, or to pay $25 per share in cash without condition. The executive committee at once sent to all of its stockholders a circular letter, in which they state, among other things: "After a careful consideration of the condition of the company, the executive committee have negotiated with the L. D. Garrett Company [the plaintiff], and have secured from that company the following proposition;" and they then quote plaintiff's proposition in full, and urgently recommend its acceptance by the stockholders. Pursuant to the proposition and notice, a large majority of the stock was deposited and paid for by the plaintiff in cash at the rate of $25 per share. The defendant Halsey was the owner of 80 shares of stock of the par value of $8,000, and plaintiff paid him $2,000 for the same. The defendant Simpson owned 122 shares, of the par value of $12,200, and plaintiff paid him $3,050. The defendant Page owned 40 shares, of the par value of $4,000, and the plaintiff paid him $1,000. Shortly after the stock had been delivered and paid for, plaintiff discovered that the statement of April 1st, in question, was grossly false in almost every respect; that instead of a balance of cash in bank, which was stated to be $1,085.75, it was discovered that there had been checks drawn against the account, prior to April 1st, aggregating more than $20,000 over the amount of such alleged balance; that the amount reported due for unearned premiums was greatly exaggerated; that the amount of reinsurance reserve for which the company was liable, as set forth in the statement, was $68,623.56, whereas such liability was upward of $170,000, and that said statement was equally false in other respects; so that instead of having assets sufficient to meet all their liabilities, and leave for the stockholders about $120,000 out of which to pay their stock of $200,000, there were not sufficient assets to meet their liabilities, and the company was on April 1, 1900, entirely insolvent, its capital stock wiped out, and a large deficiency due to creditors, for which stockholders were liable pro rata. The result to plaintiff is that, while it paid about $40,000 for the stock, it not only receives nothing for it, but becomes liable as stockholder for the proportion of the debts of the company. The defendants in each of these actions were stockholders, directors, and members of the executive committee, and each of them took an active part in the negotiations with plaintiff.

The plaintiff now invokes the aid of the equitable powers of this court to place it where it was, as to these defendants, before the contract was made; to rescind the contract, retransfer the stock, and be released from liability. I think that the law governing this case was well stated by General Tracy when the real facts were brought to his attention, and he said to plaintiff's president, Mr. Garrett:

"If you made a mistake in estimating the value or the amount which you could realize from these assets, I shall consider myself under no obligation to return the money; but if you have been misled, and I have been misled, I shall return the money."

The defendants were compelled to accept one of the two horns of the dilemma with which they were confronted; they were either bound to say that they knew or believed the statement of April 1st to be untrue, and thereby commit a fraud by the suppression of the truth, or they must say that in all their dealings with the plaintiff they acted upon the faith of the statement, and believed it to be true in all respects. They are all men of high standing and repute in the business community, engaged in large business undertakings and enterprises outside of their connection with this company, and of course they chose the latter and no doubt the true state of the case. Therefore we have this bald proposition: The defendants, believing that they had certain property to sell, as represented by the statement, offered it for sale to the plaintiff at a certain price, and upon the faith of the statement, with the exception of the amount of unreported losses not set forth, the entire negotiations with plaintiff were had on the strength of the statement, and in reliance upon its truth. It cannot be said that the parties were dealing at arm's length. The defendants presented a statement of the condition of their company, in regard to which they may certainly have been supposed to have as much or more information than plaintiff. Plaintiff acted upon the faith of the statement, and defendants intended that it should be, and it was, misled to its injury. It cannot be supposed or argued for a moment that these defendants, knowing that they had nothing to sell, intended to take plaintiff's money, and not only give it nothing for it, but put it in a position of having to pay the debts of the company in addition. Nor can it be supposed that, if they or either of them had been aware of the facts as they now exist, they would have offered to sell to plaintiff. It must, therefore, be concluded that defendants acted in mistake and ignorance of the real facts, and the evidence and reason certainly show that plaintiff relied upon the statement absolutely, and would not have made the purchase had it been aware of the true state of the case, and also that defendants knew, or should have known, that it was acting in reliance upon its truth. This is not a case of a business mistake as to the value of a certain thing bargained for, or of the probable price which could be obtained for certain marketable articles, but it is a case of mutual mistake going to the bottom of the entire transaction, and in that respect differs from the cases cited by the learned counsel for defendants. It seems quite clear to me that, if the agreement here in question were executory instead of executed, no court of equity would enforce it against the plaintiff under the circumstances disclosed by the evidence, and there is no reason why the court should not also act although the contract is executed. Stewart v. Lester, 49 Hun, 58, 1 N. Y. Supp. 699; Paine v. Upton, 87 N. Y. 327, 41 Am. Rep. 371. The plaintiff acted with great promptness upon its discovery of the true state of facts, and demanded a rescission of the contract, and tendered redelivery and transfer of the stock; no new rights have in-

tervened; the parties can be placed exactly where they were before the contract was made. I am of opinion that the language of Judge Story, quoted by defendants' counsel, is particularly applicable to the facts of this case:

"Mistake or ignorance of facts in parties is a proper subject of relief only when it constitutes a material ingredient in the contract of the parties, and disappoints their intention by a mutual error, or where it is inconsistent with good faith, and proceeds from a violation of the obligations which are imposed by law upon the conscience of either party. But where each party is equally innocent, and there is no concealment of facts which the other party has a right to know, and no surprise or imposition exists, the mistake or ignorance, whether mutual or unilateral, is treated as laying no foundation for equitable interference."

The mistake and ignorance of fact in this case constitute a material ingredient of the contract, and disappoint the intention of the parties through a mutual error. The defendants did not intend to sell, nor the plaintiff to buy, an utterly worthless thing, but through a mutual misunderstanding and mistake of facts that is what resulted. There was surprise to both parties; the defendants were equally surprised with the plaintiff to discover that the goods which they had sold were worse than worthless; and their attempt to reap and retain the fruits of the mutual surprise and mistake constitutes a moral fraud. There can be no question but what plaintiff was imposed upon, and, if defendants speak truly, they were equally imposed upon. It was their plain duty, the moment their attention was directed to the mistake, to have reinstated the plaintiff in its rights as they existed before the making of the contract.

I have examined the authorities with some degree of care, and fail to discover any which hold contrary to the views herein expressed; but I have found a number which seem to bear out the contention of plaintiff. My attention was called to an illustration of a case in which equity would relieve from a mistake. If a party agreed to sell to another a parcel of land, both parties believing it to exist, but it had been entirely washed away by a flood, equity would relieve the purchaser. We might go further, and say that if nine-tenths of it had been washed away equity would still relieve the purchaser. But the court of appeals has gone much further than this, and has held in the case of Belknap v. Sealey, 14 N. Y. 143, 67 Am. Dec. 120, that where parties had agreed to sell and purchase a piece of land stated to contain "nine acres, less one acre and six perches sold," and both parties believed the statement, and the purchaser went on the land, and casually examined it, and it turned out upon survey that there were only a little more than four acres, in an action brought by the purchaser to rescind the contract he was allowed to recover on the ground of mutual mistake of fact, although defeated in his claim to recover on the ground of fraud, because he was misled as to the quantity of land, and relied upon the representations which were not true, although innocently made. See, also, Stewart v. Lester, 49 Hun, 58, 1 N. Y. Supp. 699; Redgrave v. Hurd, 20 Ch. Div. 1. The language used by the court in the last case is peculiarly applicable to the facts in the case at bar. In that case, the court said:

"As regards the rescission of a contract, there was no doubt a difference between the rules of courts of equity and the rules of courts of common law,—a difference which of course has now disappeared by the operation of the judicature act, which makes the rules of equity prevail. According to the decisions of courts of equity, it was not necessary, in order to set aside a contract obtained by material false representations, to prove that the party who obtained it knew at the time when the representation was made that it was false. It was put in two ways, either of which was sufficient. One way of putting the case was: 'A man is not to be allowed to get a benefit from a statement which he now admits to be false. He is not to be allowed to say, for the purpose of civil jurisdiction, that when he made it he did not know it to be false; he ought to have found that out before he made it.' The other way of putting it was this: 'Even assuming that moral fraud must be shown in order to set aside a contract, you have it where a man, having obtained a beneficial contract by a statement which he now knows to be false, insists upon keeping that contract. To do so is a moral delinquency; no man ought to seek to take advantage of his own false statements.' The rule in equity was settled, and it does not matter on which of the two grounds it was rested."

The case of Martin v. Hill, 41 Minn. 337, 43 N. W. 337, is very similar to the case at bar, and was an action brought to rescind a contract for the purchase of stock of a corporation on the ground of a misstatement of material facts. The court in that case rescinded the contract, and states in the opinion:

"Assuming that the facts as to which, according to the findings, the false representations were made, were material, and such as the plaintiffs, if they believed them, had a right to rely and act upon, there is really no question of law in the case. That one who, making a purchase, does not get by it substantially what, from the false representations of the vendor as to material facts, he had a right to believe, and does believe, he is purchasing, may have a rescission of the contract of purchase if he is guilty of no laches, is beyond question. It would be the grossest injustice to hold a party to a purchase, where, solely through the fault of the other party, he gets only what he did not intend to buy; and to this right of rescission it is not essential that the false representations were made with the actual intent to defraud. The right is not based upon actual fraud, but on a material mistake of facts because of the fault of the other party. And it is, in general, a fault, in a party to negotiations for a contract, to state positively as a fact, as though he knew it to be such, what he does not know to be the fact, where the other party has a right to believe he knows it to be a fact, and does not himself know, and has not equal means of knowing, what the fact is."

I have not considered the question of the legality or illegality of the contract before the court, as it is not raised by the pleadings, nor is it referred to by defendants' counsel in his brief, but I am inclined to think from the statement of the contract by the parties, and from the written proposal and acceptance, that there is nothing to show any illegal intention on the part of plaintiff in the purchase of the stock. There must be judgment for the plaintiff in each case as prayed for in the complaint, with costs and an allowance of 5 per cent.

Judgment for plaintiff in each case, with costs and an allowance of 5 per cent.