(88 Misc. Rep. 615)

## BLOOMQUIST v. FARSON et al.

## SNOW v. SAME.

(Supreme Court, Equity Term, Chautauqua County.   January 20, 1915.)

1. CANCELLATION OF INSTRUMENTS (§ 45*)—BURDEN OF PROOF—FRAUDULENT REPRESENTATIONS.

A party, suing in equity to rescind a contract because induced by the fraudulent representations of the other party thereto, need only prove the making of material representations actually false, without proving knowledge by the other party of their falsity.

[Ed. Note.—For other cases, see Cancellation of Instruments, Cent. Dig. §§ 100, 101;  Dec. Dig. § 45.*]

2. FRAUD (§ 9*)—REPRESENTATIONS CONSTITUTING ACTIONABLE FRAUD.

The assertion of material things to be true as though made from actual knowledge, if in fact untrue, are fraudulent representations, supporting an action for fraud.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 8;  Dec. Dig. § 9.*]

3. PRINCIPAL AND AGENT (§ 171*)—TRANSACTIONS WITH AGENT—FRAUD OF AGENT—RATIFICATION.

A principal, who receives the benefits of sales made by his agent, is responsible for the agent's fraudulent representations, whether authorized or not.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 644–655;  Dec. Dig. § 171.*]

Actions by Otto Bloomquist and by Wallace L. Snow against John Farson and others.  Judgment for plaintiffs.

Arthur C. Wade and Louis L. Thrasher, both of Jamestown, for plaintiffs.

Hawkins, Delafield & Longfellow, of New York City (Adelbert Moot and Helen Z. M. Rodgers, both of Buffalo, of counsel), for defendants.

WHEELER, J.   These two actions were tried together, and present substantially the same questions of law, although the facts in the two cases are somewhat different.   The transactions out of which these actions spring were consummated with each plaintiff by and through the same agency and at substantially the same time.   The actions were brought in equity to set aside the purchase and exchange of certain bonds, on the ground that the sale was induced by false and fraudulent representations in regard to them.

In November, 1910, the plaintiff Bloomquist purchased of the defendants 10 bonds of the North Sterling irrigation district, of Logan county, Colo., and also 10 bonds of the Greeley-Poudre irrigation district, of Weld county, Colo.   At the same time the plaintiff Snow bought of the defendant 8 bonds of the North Sterling district and 8 bonds of the Greeley-Poudre district.   These bonds were each of the par value of $500, and bore interest at the rate of 6 per cent. per annum.   In payment of the purchase made by Bloomquist, he transferred 10 bonds of Union Traction Company of Kansas, each of the par value of $1,000, bearing 5 per cent. interest.   The difference in

the agreed price between said bonds was adjusted by Bloomquist paying the defendants the sum of $210.91. Snow, in payment of the bonds purchased by him, transferred to the defendants 8 bonds of the Illinois Traction Company, of the face value of $1,000 each, and adjusted the difference in their agreed value by paying the defendants $2.10. The two plaintiffs were copartners in the furniture business.

The actual negotiations for the sale of these bonds were conducted by a sales agent of the defendant named Warner. The representations inducing the sale of these bonds were of two classes, printed circulars and oral statements made by Mr. Warner. Prior to the sale, several conferences were had with the plaintiffs, in some of which both plaintiffs were present, while in others each plaintiff took part in the absence of the other. In the circular describing the North Sterling district and the issue of bonds in connection therewith, it was stated:

"It embraces over 80,000 acres in Logan county, Colorado."

Under the heading "Value of Land" it was stated:

"The bonded debt per acre is about $25—this issue of bonds."

Under the heading "Ownership of Land" it was stated:

'The land is not owned by large companies or in large tracts. On the contrary, it is largely held by well-to-do people of Sterling and Denver, who own the land in tracts averaging 160 acres."

Warner stated to the plaintiffs that the North Sterling irrigation district covered about 80,000 acres of valuable lands; that the irrigation works were completed, and the water would be turned on the following spring; that the bonded indebtedness represented about $25 an acre; that the taxes to meet the interest charges were to be collected ·by the county treasurer, the same as other taxes—compared it to a school tax in this state, and said there could be no chance of their getting out of it any more than they could get out of a school tax; that the land was owned by people in small parcels averaging about 160 acres, and that the bonds were a lien ahead of anything else; that there had never been a default in Colorado irrigation bonds, and that one of the defendants had made a personal inspection of it, and that as soon as the land had water it would be worth from $125 to $250 per acre.

It would appear that Mr. Warner's instructions and points as to the sale of these bonds were obtained from a Mr. Cunningham, connected with the defendants' office, and from statements contained in the printed circular. Warner further stated the taxes were in the hands of the county treasurer for the payment of the coupons to fall due the succeeding spring. As matter of fact, the representations made as to the North Sterling district were false and untrue in these particulars: Instead of there being 80,000 acres of land, there was only about 54,000 acres. Of this about 40,000 acres is what is called "deeded land" (the estimate varies), and the balance was what is called "government land." By "deeded land" is meant lands for which the holders had received conveyances of the title. Then there were homestead entries, where, under section 2289 of the Revised Statutes of the United States, applicants have entered upon a homestead of 160

acres, and which may ripen into title; but, to accomplish this, the homesteader must reside upon such lands and cultivate them for a period of five years.

In addition to these classes are what are termed "desert entries," where lands are acquired by application to the government for an amount of land not exceeding 320 acres, upon which a payment of 25 cents an acre must be made at the time of the application. Evidence must be produced, also, of an intention to reclaim the tract by irrigation, and the source of supply must be pointed out. Then for a period of three years the occupant must provide for reclamation of such lands at the rate of at least $1 per acre. Upon proof of compliance with these conditions, and an additional payment to the government, a patent will issue giving title. So that, in neither of the latter cases, does the occupant get title until there has been a full compliance with the provisions of the statute.

Instead of there being 80,000 acres in the North Sterling district, there was only about 54,000 acres, of which only about 40,000 acres were owned by occupants, and the balance was not subject to any irrigation tax so long as the title remained in the government. The irrigation system was not, in fact, fully completed; the dam was not entirely finished, nor were the railroad bridges constructed; and the water, as matter of fact, was not turned into the reservoir until March, 1912. The system was not completed in other districts, although the work was nearly completed. Instead of the bonded indebtedness being about $25 per acre, on the basis of an acreage of say 44,000 acres, it was nearly $50 an acre. Instead of the land being owned in small parcels, it appeared that 50 people, at the outside, owned the land in the district, outside of that owned by the government, averaging about 880 acres apiece. The county treasurer had not, in fact, received, by way of taxes, money to meet the interest charges on the bonds as stated, but the company constructing the irrigation system had paid the money to pay the coupons.

As to the Greeley-Poudre irrigation district bonds, it was stated in the printed circulars:

"The Greeley-Poudre irrigation district adds 125,000 acres to this magnificent empire. * * * The new district embraces 125,000 acres adjacent to the old irrigated Greeley district."

Warner represented to the plaintiffs that the irrigation system of the Greeley-Poudre was completed, and the water would be turned on in the following spring (1911), and the interest there was to be collected and paid by the county treasurer, the same as in the North Sterling district; that the tax had been levied and collected to pay the coupons in June and December, 1911. He stated the work was substantially or practically done; that there was a tunnel going through a mountain, where they were going to get an absolutely sure water supply.

As matter of fact, the evidence shows that, instead of the district having 125,000 acres, it contains about 77,000 acres of deeded land; that, instead of the irrigation system being nearly completed, only about 60 per cent. of the work had been done. It never has been finished, and no water has ever been turned on. The district never has completed

title to its source of supply. The project involved tapping the Laramie river in the state of Wyoming for water; but before the district was in condition to take water from the Laramie river the state of Wyoming brought an action in the United States Supreme Court to restrain the diversion of the waters of the stream. The action is still pending. If it is decided adversely to the state of Colorado, the entire project will fail. In the meantime, the prosecution of the work on the system is suspended, the interest coupons have been defaulted, and the bonds are of very little value. The same is true of the irrigation bonds of the North Sterling district.

Sufficient has been stated to show that material misrepresentations were made as to the bonds of both these irrigation districts. They induced the purchase of the bonds in question by the plaintiffs, who relied on the truth of the statements made. These actions seek the rescission of the two sales and a return of the bonds exchanged, and, in case such bonds cannot be returned, for a judgment for their value.

[1] The representations made by the defendants, the evidence tends to show, were largely induced by reports made their firm by residents of the state of Colorado on various features of the two projects, and upon which the defendants doubtless relied in drafting their circulars inviting purchase of the bonds. Mr. Warner, the defendants' agent, through whom the sales were negotiated, was called as a witness for the plaintiffs, and testified to the making of the statements alleged, substantially as claimed by the plaintiffs, and in this connection testified that at the time they were made he honestly believed them to be true, and they were made with no intent of defrauding the plaintiffs. The court has no occasion to question his testimony in that respect. The defendants' concern, for all that appears, is and was a reputable business house, and it is quite probable that in issuing the circulars it relied on information obtained from others. Nevertheless the circulars and statements made were false and untrue in the particulars stated.

It is contended on the part of the defendants that they acted in good faith, and invested millions of dollars of their own money in the securities, a portion of which were sold to the plaintiffs, and that, in order to recover, the plaintiffs must show, not only the falsity of the representations, but knowledge on the part of the defendants of their falsity, and that there is lacking in this case the latter element.

These actions are in equity to rescind the contracts of sale, and we are of the opinion differ materially from ordinary common-law actions for fraud and deceit. It may well be that in an action at law for fraud and deceit, accompanied with the right of arrest and a body execution, in order to entitle the plaintiff to the benefit of such remedies, they should satisfy the court of "scienter" on the part of the defendants. Where, however, the action is one in equity simply to rescind contracts induced by false representations, we can discover no good reason why the rule invoked by the defendant should be applied. If we may assume that the defendants in this case were innocent of any fraudulent intent, and acted in good faith in negotiating the bonds sold, relying on the truth of the representations made, nevertheless, after their falsity became known, it would be a species of fraud on their part to retain

the fruits of the transactions. To permit such transactions to stand would, in our opinion, be a denial of plain ordinary justice.

If these views of the law are not already fully established by the decisions of the courts, it is quite time they should be. It was said in Squiers v. Thompson, 73 App. Div. 556, 76 N. Y. Supp. 736, that:

"In equity the fraudulent intent of the defendants need not be proven, while at law such an intent must be established; and this is an additional reason why resort may be had to equity. See Cook on Corp. § 356."

This case was affirmed in 172 N. Y. 652, 65 N. E. 1122.

In Lyon v. James, 97 App. Div. 385, page 391, 90 N. Y. Supp. 28. the doctrine above laid down was recognized as the law, and an action in equity placing the parties in statu quo was sustained, although as to some of the defendants there was an absence of proof that they had been guilty of actual and intentional fraud. This case also was affirmed in 181 N. Y. 512, 73 N. E. 1126.

Cook on Corporations, § 536, speaking on the subject under discussion, says:

"A vendee may often have relief in equity by reason of misrepresentation based on mistake or innocent misstatements, where the common-law action of deceit would require more stringent proof. Actual fraud need not be proved in an action for rescission, where falsity of material representations is clearly proved. Moreover, the contract of sale may be canceled by a court of equity on the ground of a mutual mistake where the representations were innocently made."

The case of Hammond v. Pennock, 61 N. Y. 152, was one in equity to rescind a contract based on misrepresentation or suppression of the truth. Discussing the right of the plaintiff to relief, the court said (page 152):

"The case has thus far been considered as though the fraud requisite as a basis for rescinding a contract in equity is the same in nature as that demanded in a court of law in an action for damages for deceit. In equity, the right to relief is derived from the suppression or misrepresentation of a material fact, though there be no intent to defraud. Per Lord Romilly, in Peek v. Gurney, L. R. 13 Eq. 79, 113; Wilcox v. Iowa University, 32 Iowa, 367. This view has been applied to innocent misrepresentations in a prospectus, providing that they were of the essence of the contract. Smith v. Reese River Co., L. R. 2 Eq. 264; Kennedy v. Panama Co., L. R. 2 Q. B. 580. This doctrine is, substantially, grounded in fraud, since the misrepresentation operates as a surprise and imposition upon the opposite party to the contract. It is inequitable and unconscientious for a party to insist on holding the benefit of a contract which he has obtained through misrepresentations, however innocently made. Story on Eq. Jur. § 193, and cases cited; Perry on Trusts, § 171."

See, also, Carr v. Nat. Bank & Loan Co., 167 N. Y. 379, 60 N. E. 649, 82 Am. St. Rep. 725; Garrett v. Halsey, 38 Misc. Rep. 438, 77 N. Y. Supp. 989; Tucker v. Osbourn, 101 Md. 613, 61 Atl. 321.; Cahill v. Applegarth, 98 Md. 503, 504, 56 Atl. 794; Martin v. Hill, 41 Minn. 337, 43 N. W. 337; also the very recent case, Canadian Agency Company, Limited, v. Assets Realization Co., Impleaded, 150 N. Y. Supp. 758, decided by the Appellate Division of the First Department, not yet appearing in the official reports, citing many cases sustaining the views above expressed.

In the last analysis, the right of recovery in such a case rests on the fundamental proposition that, where one of two innocent parties must suffer, he must bear the loss who was instrumental in causing the damage. Assuming the defendants to be free from any intentional wrong in selling the bonds upon the representations made, nevertheless their representations caused the sales to be made, and .they must be held liable for the consequences.

[2] There is another principle of law touching cases of this kind, which we think may properly be invoked to support a recovery in these actions. It is that the assertion of material things to be true, as though made from actual knowledge, if in fact such are untrue, constitute false and fraudulent representations sufficient to support an action for fraud and deceit. Rothschild v. Mack, 115 N. Y. 1, 21 N. E. 726; Kountze v. Kennedy, 147 N. Y. 124, 41 N. E. 414, 29 L. R. A. 360, 49 Am. St. Rep. 651; Hadcock v. Osmer, 153 N. Y. 604, 47 N. E. 923; Armour v. Insurance Co., 90 N. Y. 450; Kasprzyk v. Insurance Co., 79 Misc. Rep. 263, 140 N. Y. Supp. 211.

[3] Warner was the agent of the defendants. They received the benefits of the sales made by and through him, and are to be held to responsibility for Warner's representations, regardless of whether such representations were authorized by them or not. The law is succinctly stated in Taylor v. Commercial Bank, 174 N. Y. 181, 66 N. E. 726, 62 L. R. A. 783, 95 Am. St. Rep. 564, where the court said:

"It is an established principle of law that where a person acts for another, who adopts the fruits of his efforts, the latter must be deemed to have adopted the methods employed, as he may not, even though innocent, receive the benefits and at the same time disclaim responsibility for the fraud by means of which they arose."

See, also, Garner v. Mangam, 93 N. Y. 642; Krumm v. Beach, 96 N. Y. 398; Fairchild v. McMahon, 139 N. Y. 290, 34 N. E. 779, 36 Am. St. Rep. 701; Downey v. Finucane, 146 App. Div. 217, 130 N. Y. Supp. 988.

I am of the opinion the plaintiffs are entitled to judgment in these actions rescinding the contracts and directing a return to them of the securities delivered to the defendants, and the repayment of the money paid, or, if the defendants are unable to restore the consideration passed to them, then for a judgment for the value of what they turned over to the defendants. The plaintiffs are also entitled to recover the costs of the actions.